Deborah M. PETERS, Plaintiff,

v.

COMMUNITY ACTION COMMITTEE, INC. OF CHAMBERS–TALLAPOOSA–COOSA, Defendant.

Civil Action No. 97–T–150–E.

United States District Court, M.D. Alabama, Eastern Division.

Sept. 19, 1997.

James M. Sizemore, Jr., Montgomery, AL, for Plaintiff.

G. Daniel Brown, Radney, Radney & Brown, P.A., Alexander City, AL, for Defendant.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiff Deborah M. Peters brings this lawsuit charging that her former employer, defendant Community Action Committee, Inc. of Chambers–Tallapoosa–Coosa (CAC), reassigned her from one position to another and ultimately constructively discharged her, in violation of the Family and Medical Leave Act of 1993 (the FMLA), 29 U.S.C.A. §§ 2601–2654. Jurisdiction arises under 29 U.S.C.A. § 2617(a)(2) and 28 U.S.C.A. § 1331. The case is now before the court on the CAC's motion for summary judgment, filed July 8, 1997. For the reason that follow, the motion is denied in part and granted it in part.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

In as brief a manner as is feasible, the court will give a summary of the facts relevant to CAC's motion for summary judgment, with disputed facts resolved in favor of Peters for purposes of the pending motion.

*December 1990:* Peters was hired by CAC as a secretary.[1]

*January 22, 1995:* Peters gave birth to a daughter, Morgan.[2] Following Morgan's birth, and during the last two years of Peters's employment at CAC, Morgan suffered from respiratory problems that caused her to be ill with some frequency. On two occasions, she suffered from pneumonia that required hospitalization.[3] Both hospitalizations occurred before Peters was promoted in August 1996.

*August 1996:* Peters was promoted to a new position, which included both her secretarial duties and some bookkeeping duties.[4]

*December 2–10, 1996:* Morgan became ill again, and her illness required regular respiratory treatments by her doctor. This prompted Peters to take seven days off from work.[5] During this time, Peters informed CAC as to why she was off, and she kept in periodic contact with it.[6]

*Early December 1996:* CAC was having problems with its funding; the agency had not received block grants it needed from the State of Alabama to meet all its expenses.[7] The delay in receiving the block grants necessitated CAC taking some action to cope with its financial difficulties. As a result, CAC took a loan from Charles Mack Bradley,[8] its finance director, and postponed issuance of a paycheck to Evelyn Kelly,[9] its finance assistant. CAC also decided to lay off four employees and reassign Peters from her current to her former position.[10]

*December 13, 1996:* Two days after Peters returned from caring for Morgan, she was notified that she would be reassigned from her current position to her former position.[11] The reassignment had a corresponding reduction in pay.

*December 16, 1996:* Peters's reassignment took effect. The layoff of four employees also took effect.

*Late December 1996:* Shortly after her reassignment, Peters overheard Bradley, her supervisor for her accounting duties, state to David Boleware, the executive director of the agency,

> "that his father had passed away and he was up 'til 2:00 o'clock. Why couldn't [Peters] come to work if [she] had a sick child and [Bradley] had a death in the family?"[12]

Peters requested a meeting with Boleware on several occasions, but was never granted one.[13]

*January 1997:* The loan that CAC took was repaid,[14] Kelly's paycheck was issued,[15] and the four laid-off employees were returned to work on January 13, 1997.[16] Peters was, however, never restored to her position.

*February 10, 1997:* This lawsuit was filed.

*February 14, 1997:* Peters had a confrontation with Bradley in her office.[17] The confrontation arose out of some procedures Peters was supposed to follow in her job, but had not been following, and related to whether she had been given notice of the proce-

---

1. CAC's motion for summary judgment, deposition of Deborah M. Peters, at 15, filed July 8, 1997 (hereinafter "Peters Deposition").

2. *Id.* at 7.

3. *Id.* at 34–35.

4. *Id.* at 19.

5. *Id.* at 30, 36–40.

6. *Id.* at 39–40.

7. CAC's motion for summary judgment, deposition of Charles Mack Bradley, at 7–8, filed July 8, 1997 (hereinafter "Bradley Deposition").

8. *Id.* at 22–23.

9. *Id.* at 23.

10. *Id.* at 8–9, 13–14.

11. Peters Deposition, at 45–47; Bradley Deposition, at 18–20.

12. Peters Deposition, at 70.

13. *Id.* at 54–55.

14. Bradley Deposition, at 23.

15. *Id.* at 24.

16. *Id.* at 11.

17. Peters Deposition, at 55–62, 70–71.

dures.[18]  Bradley yelled at Peters in front of other employees.[19]  He also came across the desk to meet her eye-to-eye, but he did not curse her or threaten her.[20]  Peters did not return to work after this incident.

*February 17, 1997:*  Peters went to CAC to speak with Boleware, the executive director. She told him about the February 14 incident, of which he said he had already been informed by Bradley, and about which he said he would try to get everything straightened out.  Peters informed Boleware that she was thinking about resigning, and he asked her not to.[21]

*February 19, 1997:*  Peters spoke with Boleware again, informing him of her decision to resign; Boleware said he wished she would not resign, and that things could be worked out.  Peters told him that she had tried to work things out, and had asked for several meetings, but never received one.[22] Peters submitted her letter of resignation.[23]

*August 7, 1997:*  In a jointly prepared and submitted pretrial order, Peters amended the complaint in her lawsuit to include two claims:  she was reassigned from one position to another and ultimately constructively discharged, in violation of the FMLA.

### III.  DISCUSSION

#### A.

The FMLA provides for two types of broad protections to employees.  The first protections, found in 29 U.S.C.A. §§ 2612 and 2614, confer new and affirmative entitlements and thus are essentially *prescriptive.* Subsection (a)(1) of § 2612 provides, in part, that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:  (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter[;] (B) Because of the placement of a son or daughter with the employee for adoption or foster care[;]

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition[; or] (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  Subsection (a)(1) of § 2614 further provides, in part, that "any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced;  or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."

This restoration right is subject to a number of limitations under the FMLA, including the following limitations in subsection (a)(3) of § 2614:  A restored employee is not entitled to "(A) the accrual of any seniority or employment benefits during any period of leave;  or (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  Subject to these and other limitations, therefore, a restored employee "does not step back on the [employee benefit] escalator at the point [s]he stepped off."  *Fishgold v. Sullivan Drydock & Repair Corp.* 328 U.S. 275, 284–285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946).  Rather, she "steps back on at the precise point [s]he would have occupied had [s]he kept h[er] position continuously."  *Id.*

The second FMLA protections, found in 29 U.S.C.A. § 2615, bar certain discriminatory conduct and thus are essentially *proscriptive.* Subsections (a) and (b) of § 2615 provide, in part, that it shall be unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," "to discharge or in any other manner discrimi-

---

**18.**  *Id.*

**19.**  *Id.* at 58–60.

**20.**  *Id.* at 58–59.

**21.**  *Id.* at 63–67.

**22.**  *Id.* at 67–68.

**23.**  *Id.* at 82.

nate against any individual for opposing any practice made unlawful by this subchapter," or "to discharge or in any other manner discriminate against any individual because such individual ... has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter." [24]

These two types of FMLA protections are not mutually exclusive, however, for, not only do the proscriptive provisions bar discriminatory treatment, they also, bar failure to comply with the prescriptive provisions.

The relief available under the FMLA for violation of these prescriptive and proscriptive provisions includes lost wages and other benefits, actual damages, and liquidated damages. 29 U.S.C.A. § 2617(a)(1). A federal court's authority to enforce these provisions is found in 29 U.S.C.A. § 2617(a)(2), which provides that, "An action to recover the damages or equitable relief ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of—(A) the employees; or (B) the employees and other employees similarly situated."

To the extent that the sole question presented by the parties in an FMLA case is whether an employee has received her *entitlements* under the FMLA—for example, a 12–week leave or reinstatement—the employer's intent may be immaterial. In other words, because the issue is the right to an entitlement, the employee is due the benefit if the underlying requirements are satisfied, regardless as to the intent of the employer.

However, once one of the parties raises the issue of whether a right, benefit, or position is one to which the employee would have been entitled had the employee not taken the leave or whether the employer has taken adverse action against the employee for having exercised an FMLA right, the question of intent may become relevant. In the former instance, the employer's intent may be descriptive of whether a right, benefit, or position would have been conferred had the employee not taken leave under the FMLA; in the latter instance, the employer's intent would be indicative of whether its conduct was motivated by retaliation or discrimination that is impermissible under the FMLA.

### B.

Here, as stated, Peters charges that she was reassigned from one position to another and was ultimately constructively discharged for having exercised her rights under the FMLA. She alleges that CAC acted with both discriminatory and retaliatory intent. She has therefore framed her claims as turning on her employer's intent.

As with a claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, a plaintiff may prove discrimination and retaliation that is impermissible under the FMLA through either direct or circumstantial evidence. There is disagreement among the Courts of Appeals and even within the Eleventh Circuit Court of Appeals as to how to define 'direct evidence' of discrimination or retaliation.[25] In *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1554 (1990), the Eleventh Circuit adopted a fairly broad definition of direct evidence, stating that "direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation of the employee." However, in *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir.1993), the court opted for a much narrower definition, stating that "[E]vidence is direct when it is sufficient to prove discrimination without inference or presumption. Only the most blatant remarks whose

---

24. Although by the language of § 2615(a) alone it is not clear that it is the appropriate provision to vindicate every violation of rights under the FMLA, 29 C.F.R. § 825.220(b) makes it clear by providing that *"[a]ny violations* of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act" (emphasis added).

25. A recent commentator on the confusion over direct evidence stated that many circuits have "enshrouded their holdings in a semantic haze, which partially obscures the scope of their definitions of direct evidence." Robert Brookins, *Mixed–Motives, Title VII, and Removing Sexism from Employment: The Reality and the Rhetoric,* 59 Alb. L.Rev. 1, 86 (1995).

intent could be nothing other than to discriminate constitute direct evidence." (citations omitted). Most recently, in *Haynes v. W.C. Caye & Company, Inc.*, 52 F.3d 928, 930 (11th Cir.1995), the court held in an age discrimination case that a supervisor's question whether "a sweet little old lady could get tough enough with customers and collect the money" constituted direct evidence of discrimination, even though the woman was subsequently hired by the supervisor who made the statement. The court in *Haynes* did not articulate the definition of direct evidence it applied. *See also Merritt v. Dillard Paper Company*, 120 F.3d 1181 (11th Cir.1997) (statement by employer's president to employee that employee's deposition was "most damning" to employer's case in coworker's Title VII proceeding and that employee no longer had place at employer, was direct evidence of retaliation).

■ If confronted with direct evidence of discrimination or retaliation, a trial court must assess the plaintiff's FMLA claim as follows: "[T]he trial judge must initially make a credibility finding as to whether or not plaintiff's proffered direct evidence . . . is to be believed. . . . The trial court must also make a finding of fact as to whether or not the decision maker 'relied upon [impermissible] considerations in coming to its decision.' . . . In other words, the fact finder must determine whether [the impermissible factor] played a motivating part in an employment decision. . . . If the trial court both credits the direct evidence and finds that the evidence played a substantial role in the employment decision at issue, then the defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role." *Haynes*, 52 F.3d at 932 (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 244, 109 S.Ct. 1775, 1786, 1804, 104 L.Ed.2d 268 (1989)).

In this case, Peters has not suggested that the evidence—even the alleged statement by her supervisor that she should be able to work even if she has a sick child—constitutes direct evidence of discrimination or retaliation.

■ However, Peters may still prove her FMLA claims through circumstantial evidence. Under the FMLA, an employee has the initial burden of establishing by a preponderance of the evidence a prima-facie case, which, if established, raises a presumption that the employer is liable to the employee under the FMLA. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, known as the *McDonnell Douglas* approach, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer took actions against the employee in violation of the FMLA. The employer can meet this burden of production by articulating a legitimate, nondiscriminatory and nonretaliatory reason for the employment decision, a reason which is clear, reasonably specific, and worthy of credence. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason. *Burdine*, 450 U.S. at 253–55, 101 S.Ct. 1093–94. Once the employer satisfies this burden of production, the focus shifts to the employee's ultimate burden of proving by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination or retaliation in violation of the FMLA. The employee may meet this burden by persuading the factfinder either *directly* that a discriminatory or retaliatory reason more than likely motivated the employer or *indirectly* that the proffered reason for the employment decision is not worthy of belief. *Id.* at 256, 101 S.Ct. at 1095.

The essence of the prima-face case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference, if left unrefuted, that the employer used prohibited criteria in making an adverse decision about the employee. Courts differ as to the appropriate prima-facie case for claims of violation of FMLA rights. Some courts have used a prima-facie case similar to that for Title VII job *discrimination* cases: (1) the employee is a member of a protected

class; (2) the employee suffered an adverse job action; (3) the employee was qualified for the position she was holding; and (4) that an employee who did not exercise, or did not attempt to exercise, her rights under the FMLA was treated more favorably. *See, e.g., Petsche v. Home Fed. Sav. Bank, N. Ohio,* 952 F.Supp. 536, 538 (N.D.Ohio 1997); *Kaylor v. Fannin Regional Hospital, Inc.,* 946 F.Supp. 988, 1001 (N.D.Ga.1996). Others have used a prima-facie case similar to that for Title VII *retaliation* claims: (1) the employee availed herself of a protected right under the FMLA; (2) the employee suffered an adverse job action; and (3) there is a causal connection between (1) and (2). *See, e.g., Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir.1997); *Dodgens v. Kent Mfg. Co.,* 955 F.Supp. 560, 565 (D.S.C.1997).

■ This difference in articulation arises for two reasons. First, as is often noted, in discrimination and retaliation cases, "[t]he facts necessarily will vary . . ., and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *United States v. City of Montgomery,* 788 F.Supp. 1563, 1573 n. 12 (M.D.Ala.1992) (*quoting McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13). Thus, "[t]he requisites for a prima facie case . . . are flexible". *Id.* (*quoting Barber v. International Brotherhood of Boilermakers,* 778 F.2d 750, 756 (11th Cir.1985)). Second, discrimination and retaliation under the FMLA blur. Because protected status under the Act is based on conduct (actual or intended), discriminatory intent and retaliatory intent are essentially the same. If an employer takes adverse action against an employee because the employee has exercised a right under the FMLA, the employer's intent could be viewed as both discriminatory and retaliatory. For these reasons, the type of prima-facie-case framework applicable to a set of circumstances should not turn on whether a discriminatory or retaliatory label is placed on the employer's intent. Rather, the applicable framework should turn on the context of the employment decision and the type of proscribed practice involved. An employee may therefore establish a prima-facie case under the FMLA by using either a so-called discriminatory framework or a so-called retaliatory framework.

■ *Peters's reassignment claim:* In this case, Peters has established a prima-facie case under both the so-called discriminatory and retaliatory frameworks. With respect to the retaliatory framework, she has produced evidence, first, that she took leave to care for her sick daughter, Morgan, and that she notified CAC that she was going to be taking sick leave for this purpose; and, second, that she returned to work after being off for seven days, and after working two more days, was subject to an adverse job action: She was reassigned to her former position, which had a corresponding reduction in pay. Finally, Peters testified at her deposition that she overheard her supervisor, one of the people directly involved in the decision to reassign her, make statements criticizing her for having taken time off to care for her daughter. With respect to the discriminatory framework, she has produced additional evidence that, of the employees who suffered adverse employment decisions as a result of CAC's financial difficulties, she was the only one who was not made whole again later. These facts are sufficient to make out a prima-facie case under both the discriminatory and retaliatory frameworks for interference with rights under the FMLA.

■ CAC has adequately responded that Peters's reassignment was part of a larger group of actions, which included taking a loan from another employee, postponing the issuance of a paycheck to another employee, and laying off four other employees, all of which were required by the agency to cope with financial difficulties that it was facing. Peters has, however, offered evidence about the state of mind of her supervisor, who was critical of her having taken leave to care for her daughter. She has also offered evidence that other measures taken to deal with the financial difficulties of the agency were remedied once the financial difficulties were over, but that she was not returned to her former position. From these facts, because it would be possible to infer that CAC's

explanation is pretextual, the evidence is sufficient to survive summary judgment.

■ *Peters's constructive-discharge claim:* Peters charges that she was constructively discharged for having complained informally that she was reassigned in violation of the FMLA and for having then subsequently filed this lawsuit. Peters has not produced evidence sufficient to make out a prima-facie case under either the discriminatory or retaliatory framework. Common to both types of prima-facie cases is an adverse employment action or decision, and she has failed to establish such.

■ Here, Peters alleges that the adverse employment action was her constructive discharge. To prove a constructive discharge, an employee "must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). The intolerable and unbearable work environment Peters alleges is based on only one incident: the February 14 confrontation with her supervisor. Although the number of incidents is not necessarily indicative of the intolerableness of an environment, an isolated confrontation with a superior, of the nature described by Peters, is insufficient to support a conclusion of a constructive discharge. *See Goldsmith v. Mayor and City Council of Baltimore,* 987 F.2d 1064, 1072 (4th Cir.1993) (agency head was not constructively discharged despite isolated incidents involving raised voices and flaring tempers, particularly where a certain amount of tension inhered in job) In this case, Peters would need to allege more than this one incident or more

facts about the one incident to have it rise to the level of a constructive discharge and thus an adverse job action.[26] CAC is entitled to summary judgment on Peters's constructive-discharge claim.

### C.

■ CAC suggests that Peters is not entitled to the protection of the FMLA because she did not notify it that she was taking leave *pursuant to the FMLA.*[27] There is no merit to this suggestion. Admittedly, the statute and applicable regulations impose a duty on the employee to give notice to the employer. When the leave is foreseeable, the FMLA (29 U.S.C.A. § 2612(e)(2)(B)) and the implementing regulations (29 C.F.R. § 825.302(a)) require the employee to give the employer 30 days notice, or as much notice as is practicable. When the leave is not foreseeable—an issue about which the Act is silent—the regulations require that the employee should give notice "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). When giving any notice for leave, however, the employee is not required "to invoke the language of the statute to gain its protection ... for leave for a serious health condition." *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir.1995); *see also* 29 C.F.R. § 825.303(b). Therefore, simply because Peters did not inform anyone that she was taking leave pursuant to the FMLA does not affect her being protected by the statute, so long as she gave notice of her daughter's serious health condition for which she was taking leave. CAC does not offer any evidence to rebut Peters's statements as to why she took leave or that she gave them notice of that.

---

26. In addition, with respect to the causation between the protected activity and the adverse job action, the so-called retaliatory prima-facie case can be satisfied by showing the chronology—that the adverse job action happened after the protected activity—and knowledge of the protected activity on the part of the employer. Although the chronology is clear—Peters filed this suit on February 10, and the incident in question occurred on February 14—Peters has not alleged knowledge on the part of the employer, to the extent she contends she was retaliated against for

having filed this lawsuit. Peters has not shown that CAC was aware of this lawsuit only four days after it was filed; and when asked if he was aware that Peters had sought counsel for her employment situation, Bradley said that he has not, and only found out after she resigned. Bradley Deposition, at 26. Peters has not rebutted this testimony.

27. *See* CAC's motion for summary judgment, narrative summary of undisputed facts, filed July 8, 1997.

## IV. CONCLUSION

For the foregoing reasons, it is OR-
DERED that defendant Community Action
Committee, Inc. of Chambers–Tallapoosa–
Coosa's motion for summary judgment, filed
July 8, 1997, is denied as to plaintiff Deborah
M. Peters reassignment claim and is·granted
as to her constructive-discharge claim. ·